**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN HANDLEY,                          )
                                       )   No. C-05-04683 SC
            Plaintiff,                 )
                                       )   ORDER DENYING
                                       )   PLAINTIFF'S MOTION
                                       )   FOR SUMMARY JUDGMENT
      v.                               )   AND GRANTING
                                       )   DEFENDANT'S
                                       )   CROSS-MOTION FOR
JO ANNE B. BARNHART, Commissioner, )       SUMMARY JUDGMENT
Social Security Administration,        )
                                       )
            Defendant.                 )
_____)

I.    **INTRODUCTION**

      Plaintiff Ryan Handley ("Claimant") filed this action against

Defendant, Jo Anne B. Barnhart, Social Security Administration

("SSA")Commissioner ("Defendant" or "SSA"), under 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of the SSA's

decision to partially reduce Claimant's retroactive Supplemental

Security Income ("SSI") benefits.

      Claimant now moves for summary judgment, arguing the SSA made

errors of law at two stages in its determination to reduce

Claimant's retroactive benefits:  by the Appeals Council in the

formulation of its remand instructions to an Administrative Law

Judge ("ALJ"); and by ALJ James Kaplan ("ALJ Kaplan")in the manner

in which he reached his determination.[1]   Defendant has responded

with a cross-motion for summary judgment, seeking a final

dismissal of this case.   Because the Court finds that 1) the Court

lacks the subject matter jurisdiction to evaluate the the Appeals

Council's remand instructions, and 2) the ALJ Kaplan correctly

conducted the hearing before him and any error committed by ALJ

Kaplan in the manner in which he formulated his decision was

harmless, the Court hereby DENIES, in whole, Claimant's motion for

summary judgment, GRANTS Defendant's Cross-Motion For Summary

Judgment, and AFFIRMS the decision of the SSA.

**II.   BACKGROUND**

The history of this case is long and multifaceted, involving

several decisions, appeals, grants, denials, and remands.   Thus,

while the instant complaint involves only the most recent set of

actions by the SSA, the Court believes that it is proper to lay

out the entire background of the dispute between the parties.   The

following facts are based on the Administrative Record ("AR").

<u>First Application for Benefits</u>

On April 1, 1995, Claimant filed his first application for

SSI benefits, under sections 1602 and 1614(a)(3)(A) of the Social

Security Act, alleging an inability to work due to a psychological

disorder ("First Application").[2]   AR at 44.   On September 1, 1995,

---

[1] As discussed below, Claimant also vaguely alleges, but does
not argue, errors of fact by the SSA.

[2] In the numerous proceedings which followed this application,
Ryan Handley and his father, Max Handley, on Ryan's behalf, are
alternatively listed in relevant documents as petitioners before
the SSA and the courts.   For the sake of clarity, the Court will
not maintain this distinction, but rather will identify Ryan

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

the SSA denied the application and, on January 25, 1996, denied it
again on reconsideration. <u>Id</u>. On September 18, 1997, after a
hearing, an ALJ denied Claimant's appeal of the decision. <u>Id</u>. On
the same day, Claimant timely requested the Appeals Council review
of the ALJ's decision. <u>Id</u>.

### Second Application for Benefits

On November 24, 1997, while his request for an Appeals
Council review of the First Application's denial was pending,
Claimant filed a second application for SSI benefits ("Second
Application"). <u>Id</u>. at 45. This time, the SSA found that Claimant
<u>was</u> disabled and so eligible for benefits, but only as of the date
on which the Second Application was filed, November 24, 1997.

### Renewed First Application

On May 7, 1999, the Appeals Council granted Claimant's
pending request for review of the denial of his First Application,
and remanded the case to ALJ John Flanagan ("ALJ Flanagan"). AR
at 44. In light of the SSA's decision granting Claimant's Second
Application, ALJ Flanagan was called on to determine only whether
the Claimant was eligible for retroactive SSI benefits for the
period from April 1, 1995 (the date when Claimant filed his First
Application) to November 24, 1997 (the date from which the SSA
found, on the basis of Claimant's Second Application, that
Claimant was eligible for benefits). <u>Id</u>. at 45.

---

Handley as the "Claimant," regardless whether a particular action
was initiated by him directly or on his behalf, and will refer to
Max Handley, when acting other than as Ryan's representative in
initiating an action before the SSA or the courts, as "Max Handley"
or "Max."

On July 30, 1993, ALJ Flanagan issued a decision based on evidence presented at a pre-trial hearing on July 23, 1993 ("ALJ Flanagan's Decision"). Id. at 44. The decision found that Claimant was disabled between April 1, 1995 and November 24, 1997 ("Interim Period"), and so was eligible for SSI benefits during this period.[3] AR at 47.

<u>Reduction of Retroactive Benefits by the SSA</u>

In an application dated September 2, 1999, Claimant requested, pursuant to ALJ Flanagan's Decision, payment of retroactive benefits for the Interim Period. Id. at 57-69. The application appears to have been filled out by an SSA employee but signed by Max Handley on August 31, 1999. Id.

In its relevant parts, the application reflects an acknowledgment by Max Handley that he provided food and shelter to the Claimant worth $1,000.00 a month ("Interim In-Kind Support"). Id. at 60. Though the application lists only "4/95," as the date of support, id., handwritten notes elsewhere on the form state that Max Handley provided Claimant this support every month of the Interim Period in the form of rent sent directly to Claimant's landlords and provision of food directly to Claimant. Id. at 68. Those notes also reflect Max Handley's agreement with the value of $1,000.00 per month assigned to the Interim In-Kind Support and his acknowledgment that the SSA will reduce Claimant's benefits as a result of the support. Id.

_____

[3]ALJ Flanagan found that Claimant suffered from personality disorder, organic brain syndrome, and substance addiction disorder. AR at 45

4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Notes of the SSA from a subsequent conversation with Max Handley similarly reflect that Max paid rent directly to Claimant's landlords, and the SSA's decision to award Claimant $14,967.50 in retroactive benefits.  Id. at 84.  On September 21, 1999, the SSA sent Claimant a letter stating the SSA's decision to award him this amount in retroactive benefits and informing him that, based on this amount, Claimant's attorney was only allowed to charge him $3,741.87 in fees.  Id.

A letter sent by Claimant's attorney to ALJ Catherine Lazuran ("ALJ Lazuran") in the context of a subsequent proceeding discussed below, describes the above outlined interactions between Max Handley and SSA as follows:

> SSA called [Max Handley] in and [he] told the worker
> that he expected to be repaid for the money loaned
> during the appeal period.  The worker[,] I guess,
> disbelieved him and denied the loan status, deducting
> $183 per month for "in kind support."

Id. at 135.  Neither the application for retroactive benefits nor any other contemporary documentation reflect that Max Handley ever made such a statement to an SSA representative or that such a statement was disbelieved by an SSA representative.

First Appeal of the Decision to Reduce Retroactive Benefits

On November 2, 1999, Claimant timely requested reconsideration of the SSA's decision to reduce the amount of retroactive benefits due to him.  Id. at 99.  The stated reason for the request was that the Interim In-Kind Support was a loan rather than a gift, and so the benefit reduction decision was erroneous.  Id.  Attached to the request was a declaration signed by Max Handley, dated "October ___ 1999" ("Declaration of Max

Handley"). <u>Id</u>. at 100.  The declaration states <u>inter</u> <u>alia</u> that
the Interim In-Kind Support "WAS A LOAN," and that if anything
else was understood by the SSA as a result of Max Handley's
conversation with them, it "was a misunderstanding." <u>Id</u>.

On March 27, 2000, the SSA issued a notice of reconsideration
affirming the benefit reduction decision.  The notice stated the
following reason for its decision: "We could not consider the
payments made by you to Ryan as a loan because he did not have a
valid means of repaying you." <u>Id</u>. at 125.  On April 4, 2000,
Claimant made a timely request for a hearing by an ALJ. <u>Id</u>. at
129.

On December 5, 2000, a hearing was held before ALJ Lazuran;
neither the Claimant nor Max Handley attended. <u>Id</u>. at 9.  In
their absence, Claimant's attorney described the situation as he
understood it, and offered to ALJ Lazuran two documents to support
Claimant's contention that the Interim In-Kind Support was a loan
rather than a gift:  the Declaration of Max Handley and a
promissory note concluded by Claimant for the benefit of Max
Handley on November 30, 2000, six days before the hearing
("Promissory Note"). <u>Id</u>. at 17.

The Promissory Note purports to "reaffirm[] former oral
promise to pay made in April of 1995 as and for funds received by
Maker from that date to the present and promises to pay to Max
Handley . . . the principal sum of TWENTY THOUSAND FIVE HUNDRED
DOLLARS with NO interest thereon." <u>Id</u>. at 142.  It further states
that this promise is given in exchange "[f]or value received."
<u>Id</u>.

On June 25, 2001, ALJ Lazuran issued a decision finding <u>inter alia</u> that: 1) Max Handley provided Claimant with in-kind support and maintenance in the approximate amount of $1,000.00 per month between April 1995 and November 1997; and 2) Max Handley's provision of the Interim In-Kind Support did not constitute a loan for SSI purposes, because "no bona fide loan agreement existed regarding the repayment of this money" ("ALJ Lazuran's Decision"). <u>Id</u>. at 11.

ALJ Lazuran purported to base the latter finding on California contract law, which "finds invalid 'an agreement that by its terms is not to be performed within a year from the making thereof.'" <u>Id</u>. (quoting Cal. Civ. Code 1624(a)(1)).[4] According to ALJ Lazuran, Claimant's monthly income from SSI payments prevented Claimant from possibly being able to perform his purported obligation to repay Mr. Handley within a year, and thus any alleged loan agreement regarding the Interim In-Kind Support was invalid. <u>Id</u>.

On August 17, 2001, Claimant made a timely request for review to the Appeals Council of the Third ALJ Decision. The request alleged that ALJ Lazuran "impermissibly ignored the California law when determining that 'no bona fide loan agreement existed,'" and that ALJ Lazuran is "biased against this claimant." <u>Id</u>. at 6.

On January 30, 2003, the Appeals Council denied Claimant's request for review and adopted ALJ Lazuran's decision as the

---

[4] The Court notes that Cal. Civ. Code 1624(a)(1), more precisely, requires such an agreement to be memorialized in a writing "subscribed by the party to be charged or by his agent."

United States District Court
For the Northern District of California

decision of the SSA ("Third Appeals Council Decision").  The
Appeals Council found that ALJ Lazuran had displayed no bias
against Claimant, and that she was correct in determining that no
bona fide loan agreement existed.  In reaching the latter
decision, the Appeals Council backed away slightly from ALJ
Lazuran's reasoning.  Instead, the Appeals Council pointed to the
testimony of Claimant's representative before ALJ Lazuran, which,
in the Appeals Councils' determination, evidenced that Claimant's
obligation to repay Max Handley was conditional, and thus "the
loan was not entered into in good faith which is a requirement for
establishing a bona fide loan agreement." Id. at 4.

<u>Court's December 2004 Stipulated Remand Order</u>

On January 28, 2003, Claimant timely filed a complaint with
this Court for review of the Third Appeals Council Decision.
After a lengthy briefing period, during which Claimant
unsuccessfully tried repeatedly to transform his claim into a
class action, the parties agreed, on December 21, 2004, to a
stipulated order remanding the case to the SSA.  Id. at 166.

The Stipulation and Order of Remand ("Court's Stipulated
Remand") stated in its relevant part:

> Upon remand, the Appeals Council will remand this case
> to an Administrative Law Judge (ALJ) and instruct him or
> her to further consider whether the claimant was
> receiving in-kind support and maintenance from his
> father during the period from April, 1995, to November,
> 1997; whether there was a valid loan agreement under
> California law between the claimant and his father as
> defined in Social Security Ruling 92-8p and <u>Cequerra v.</u>
> <u>Sec'y of HHS</u>, 933 F.2d 735 (9th Cir. 1991); and, if so,
> the effective date of the valid loan agreement.

Id. at 167-68.

United States District Court
For the Northern District of California

## Appeals Council 2005 Remand Order

On January 31, 2005, as instructed by the Court's Stipulated
Remand, the Appeals Council remanded the case to an ALJ. _Id_. at
171.  The Order of Appeals Council Remanding Case to
Administrative Law Judge ("Appeals Council 2005 Remand Order")
contains instructions to the ALJ that reiterated, almost verbatim,
the above quoted language of the Court's Stipulated Remand.  _Id_.
It further states:

> In making the above determination, the Administrative
> Law Judge will consider whether or not it was the actual
> intent of the parties that repayment would be made or
> whether there was an understanding that repayment was
> not expected and would not be pursued.  The
> Administrative Law Judge will obtain the testimony of
> the claimant and his father/representative payee and
> will question them closely regarding the terms of the
> original oral loan, subsequent "reaffirmations"[sic],
> and, finally, the written loan document.

_Id_.

## May 2005 ALJ Hearing

On May 11, 2005, a hearing was held before ALJ Kaplan.  This
time, both Claimant and Max Handley attended, and, in accordance
with the Appeals Council 2005 Remand Order, ALJ Kaplan elicited
the testimony of both.  _Id_. at 207.

The first substantive questioning was by Claimant's attorney
of Max Handley.  The questioning focused on when Claimant began
receiving SSI benefits, Claimant's condition at that time and
before, any assistance given by Max Handley to Claimant prior to
Claimant receiving benefits, and, finally, the circumstances
surrounding the creation of the Promissory Note.  Regarding the
assistance he gave to Claimant, Max Handley stated:

9

> I supported Ryan.  I not only paid his rent, but
> provided money for his well-being and food.  I didn't
> have enough for health insurance, but I realized that he
> needed help, so I helped him.

Id. at 211.  When Claimant's attorney asked Max whether this
support was given "with an understanding that [Claimant] would
repay [Max] if [Claimant] could," Max replied, "Yes, we talked
about that."  Id.

     Regarding the Promissory Note, Max expressed a fairly vague
recollection of its conclusion, and a conditional expectation that
Claimant would perform according to its terms.  Id. at 211-12.
ALJ Kaplan interjected to inquire as to the basis on which Max
expected Claimant to perform.  Id. at 211.  Max responded:

> Well if Ryan comes, if he's at some point in time able
> to hold down a full-time job and earn a good living, I
> expect him to repay this amount.  If he comes to an
> inheritance, that would be nice.  I hope that happens to
> him.

Id.  In follow-up questioning, Claimant's attorney clarified that,
other than what Max planned to leave Claimant (which Max admitted
"won't do me any good"), Max had no basis for an expectation that
Claimant would inherit any money.  Id. at 213.  Finally, Max
admitted that Claimant had not yet made any payments to Max in
satisfaction of Claimant's purported debt to him.  Id. at 212.

     ALJ Kaplan began his formal questioning of Max Handley with
an examination of the circumstances surrounding the creation of
the Promissory Note.  He first asked, "what were the circumstances
that precipitated the creation of the document of November 2000,
the promissory note?"  Id. at 214.  Max responded with a
description of a discussion he had with Claimant that repaying Max

10

United States District Court
For the Northern District of California

"at some point in time . . . would be the right thing to do" and

Max's expectation that Claimant would do so, "if [Claimant] [was]

capable of repaying this money."   <u>Id</u>.   Max finished with the

statement, "I try to make [Claimant] responsible."   <u>Id</u>.

His question regarding the circumstances surrounding the

creation of the Promissory Note unanswered, ALJ Kaplan asked it

again.   <u>Id</u>. 214-15.   Max again responded vaguely:

> Well that's a good question.  It was probably due to the
> fact that I didn't want to continue, you know,
> supporting [Claimant] with no regard to him having
> responsibility to pay me back.  It slid for a few years,
> but at one point in time, and I guess this would have
> been around the year that you mentioned[,] 2000, that I
> expected that he should be responsible to pay back [,]
> in part, some of the money that I loaned him for his
> support.

<u>Id</u>.

In response, ALJ Kaplan tried again to get at the specific

circumstances surrounding the creation of the Promissory Note by

leading Max through yes and no questions:

> ALJ Kaplan:  In with [<u>sic</u>] respect to this promissory
> note of November 2000, now it's a legal document.   Who
> prepared it?
>
> Max Handley: Ian Sammi [Claimant's attorney].
>
> ALJ Kaplan: And at that time you had pending a request
> for review, for a request for a hearing before [an]
> Administrative Law Judge with respect to the same issue
> that I am hearing today, is that correct?
>
> Max Handley: That's correct.
>
> ALJ Kaplan: Well[,] is it fair to say that the document
> was prepared in order to facilitate making -- promoting
> the position you were taking in that pending legal
> matter?
>
> Max Handley: Yes.

<u>Id</u>. at 216-17.   When ALJ Kaplan asked Max to explain this last

11

answer, he, again explained vaguely that because Max had been supporting Claimant before he received SSI benefits, Max "believ[ed] that [Claimant] should repay this money to me". Id. at 217.

Having still not received an answer to his question, ALJ Kaplan stated: "I'm still not clear as to what was intended to be accomplished through the promissory note." Id. 218. To this, Claimant's attorney interjected with a lengthy response that ended: "So as to answer, the note was created to facilitate or help the appeal that was beginning, was correct [sic]." Id. at 219. Max Handley's final and most specific statement regarding the circumstances surrounding the Promissory Note discusses the amount which the Promissory Note recites as promised to Max:

> I probably could have come up with a larger figure, but I figured that was sufficient. I mean[,] I realize that, you know, [Claimant] is going to be hard pressed to pay that back so, but I still wanted to, just felt it was right to make him accountable.

Id. at 220.

Following this lengthy exchange, ALJ Kaplan moved his examination of Max Handley as to the circumstances of the support Max provided Claimant. After establishing that Max regularly sent checks to the landlords of the locations where Claimant stayed during the Interim Period, ALJ Kaplan asked Max, "But what was your understanding in terms of what it was you were doing with these checks?" Id. at 222. To this, Max responded:

> Well[,] he's my child, so I was basically keeping him from being on the street, being homeless. So I provided for his welfare, which any parent would probably do under the circumstances.

12

**United States District Court**
For the Northern District of California

1   <u>Id</u>. at 222.

2       When, ALJ Kaplan responded that this statement was "a little

3   bit at odds" with Max's prior statements about how the support he

4   provided to Claimant was a loan, Max replied "Yeah."  <u>Id</u>. at 223.

5   ALJ Kaplan, subsequently gave Max Handley more opportunities to

6   explain his "understanding at [the] time" he was providing

7   Claimant the Interim In-Kind Support.  <u>Id</u>. at 223.  Max Handley's

8   responses consistently displayed a very general or vague

9   expectation or hope that Claimant would repay Max, "when he was

10  able to," a motivating desire by Max to provide the support so as

11  to keep Claimant "out of harm's way," and a belief that requiring

12  Claimant to pay him back would help Claimant "be responsible."

13  <u>Id</u>. at 224.

14      In reaction to this last sentiment, ALJ Kaplan queried Max

15  Handley about whether supporting Claimant caused Max any financial

16  hardship.  Max responded that it had, and, in fact, that he had to

17  "take another job to support him, which was okay."  <u>Id</u>. at 225.

18  ALJ Kaplan queried him whether that had any relationship to Max's

19  desire that Claimant pay him back:

20          And so there may have been, it was not a irrelevant
            financially [<u>sic</u>], but your primary reasons seem to be
21          more in the area of you thought it was appropriate, that
            he repay you possibly, correct?
22
23  <u>Id</u>. at 225.  To this, Max replied, "Yes."  <u>Id</u>.

24      Following this exchange, and with a brief intermission during

25  which ALJ Kaplan and Claimant's attorney discussed applicable law,

26  ALJ Kaplan continued to get at Max's intention at the time he

27  provided the In-Kind Interim Support to Claimant and, to an

28                                  13

extent, Claimant's reactions to the payments as Max perceived them.  Max described Claimant as "grateful" and with the intent to reimburse Max.  Id. at 233.  Regarding Max's intention at the time of his provision of the In-Kind Interim Support, Max responded affirmatively to ALJ Kaplan's final summary that Max's provision of support to Claimant was primarily to keep Claimant off the street and secondarily to make Claimant responsible for his own benefit.  Further, Max confirmed that he had no real expectation of Claimant being able to repay him from resources inherited nor a "realistic expectation," at the time or now, "of repayment, based on [Claimant's] work history to date."  Id. at 235.

Claimant was then examined.  His attorney first briefly had Claimant confirm that the signature on the Promissory Note was Claimant's, that Claimant had received support from Max Handley during the Interim Period, and that Claimant had had discussions with Max about repaying him for this support when he could.  Id. at 237.

ALJ Kaplan then attempted to examine Claimant, but quickly Claimant became uncooperative, confused, or both.  Asked whether he recalled when and where discussions regarding repayment occurred, Claimant responded several times with requests to his attorney to answer for him.  Id. at 237-38.  When the request was denied and the question renewed, Claimant responded, "You're asking me a question that I'm taking the Fifth Amendment on."  Id. at 238.  Claimant subsequently respond affirmatively to questions seeking confirmation that Max provided support to him for six years and that Claimant appreciated it.  Id.  But when asked

14

1  whether he ever stated anything regarding paying Max back for this

2  support, he replied again, "I take the Fifth Amendment."  <u>Id</u>.

3      Claimant's attorney and ALJ Kaplan explained to Claimant that

4  taking the Fifth was not appropriate in this context.  <u>Id</u>. at 239.

5  Seeming to understand, Claimant changed his response and confirmed

6  that he had at some point during the time he was receiving the

7  Interim In-Kind Support stated to Max his intention to pay Max

8  back, but could not recall when or where.  <u>Id</u>. at 239-40.  The

9  only basis he was able to give for how he intended to make such

10 repayment was that he would be able to do so once his attorney

11 "successfully represented [his] SSI Disability Claim."  <u>Id</u>. at

12 241.

13 <u>ALJ Kaplan's Decision Affirming Reduction of Retroactive Benefits</u>

14      On August 6, 2005, ALJ Kaplan issued a decision which

15 reaffirmed the SSA's decision to reduce Claimant's retroactive

16 benefits, based on his determination that Claimant had "not

17 sustained his burden of proving that payments made by his father

18 on behalf of claimant constitute a loan" (ALJ Kaplan's Decision").

19 <u>Id</u>. at 164.  In reaching this conclusion, ALJ Kaplan engaged in a

20 kind of two and a half part analysis based on his understanding of

21 SSR 92-8p and <u>Hickman v. Bowen</u>, 803 F.2d 1377 (5th Cir. 1986) and

22 <u>Cequerra v. Secretary of Health and Human Services</u>, 933 F.2d 735

23 (9th Cir. 1991) decisions on which SSR 92-8p is founded.

24      ALJ Kaplan's Decision states first "[a]s to issues concerning

25 the application of California law, I am ruling in favor of

26 claimant's contentions.  Nothing in California law precludes

27 finding a loan to exist under the circumstances of this case."

28

15

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   Id. at 158.  However, he continued, "[d]etermining whether a loan

2   agreement exists under SSR-8p and supporting case law is more

3   difficult to resolve."  Id.

4        The decision then identifies "generally the understanding or

5   intent of the parties to a transaction" as the "dispositive

6   issue," and lays out a two-part criteria, based on SSR 92-8p, for

7   determining it:  "(1) A loan 'means' an advance that a borrower

8   'must repay' and (2) when money is given and accepted based on any

9   understanding other than that it is to be repaid 'no loan

10  exists.'"  Id. at 158.

11       ALJ Kaplan disposed of the second part of this criteria as

12  follows:  "I find based on the totality of the evidence in this

13  case--and without a rigid application of the SSR 92-8p assignment

14  of the burden of proof to a claimant--that the record does not

15  establish an understanding that the advance of money from Mr.

16  Handley to claimant is not a loan."  Id. at 158.  Having so

17  decided, ALJ Kaplan determined that he was left only with "the

18  question of whether the payments are an advance claimant must

19  repay."  Id.

20       To answer this question, ALJ Kaplan began with a

21  consideration of the Promissory Note, which begins with:  "I do

22  not find [the Promissory Note] to constitute evidence having

23  substantial weight as to the issue whether [the Interim In-Kind

24  Support] constituted a loan."  Id.  In support of this conclusion,

25  the decision details Max Handley's ambiguous response to ALJ

26  Kaplan's questions regarding why the Promissory Note was concluded

27  (detailed supra pp. 10-14), and Max's testimony that the

28                                  16

United States District Court
For the Northern District of California

Promissory Note was drafted by Claimant's attorney to improve Claimant's legal position in his then upcoming hearing before ALJ Lazuran (detailed _supra_ p. 11).  _Id_. at 158-59.

ALJ Kaplan did not, however, formally find that the promissory note was a sham; rather, the decision states "that the note was prepared in order to satisfy what counsel believed to be the legal requirement for a written contract to be found for SSI purposes."  _Id_. at 159.  On this basis, and because no such requirement exists, ALJ Kaplan subsequently ruled that the Promissory Note's only relevance "is its reference to reaffirming an oral promise purportedly made in 1995," but that its late creation made its weight in this regard slight.  _Id_.

Having thus disposed of the Promissory Note, the remainder of the decision focuses on the testimony given by Max Handley and, to a lesser extent, Claimant regarding the circumstances under which Max provided the Interim In-Kind Support and the alleged oral agreement that Claimant would repay Max for it.  This testimony, ALJ Kaplan found, failed to prove that the Interim In-Kind Support constituted an advance which Claimant "must repay."  _Id_.  Rather, he found that the testimony of Max Handley in particular, demonstrated a conditional "hope" on Max's part that Claimant would at some point be able to pay the money back.  _Id_. at 162 This hope was based, further, not on an expectation that Claimant would fulfill a binding promise made to Max, but instead "a father's well meaning desire to see his son's mental state improve to the point where he would be able to work, with the incidental potential for repayment."  _Id_.

ALJ Kaplan "accord[ed] no probative weight to claimant's testimony." <u>Id</u>. at 163.  In particular, the decision states:

> In the context of his refusal to answer questions or provide details, his vague reference to discussions and "an understanding" about repayment fail to provide support for finding the existence of a loan based on payments that "must" be made.

<u>Id</u>.  The decision further cites, in support of ALJ Kaplan's negative credibility assessment of Claimant, Claimant's decision to "answer[] only questions of his choosing, his refusal to testify fully and his obvious ability to understand and take advantage of subtle facts . . . and testify when it was suitable and advantageous to him."  <u>Id</u>.

Finally, ALJ Kaplan noted that while Claimant has now begun to receive SSI benefits, Claimant, unlike the beneficiary in <u>Cequerra</u>, has not yet made any payments to Max Handley pursuant to the terms of the Promissory Note.  <u>Id</u>.

The particular findings of the decision state <u>inter alia</u> regarding the nature of the Interim In-Kind Support:

> 5.  California law does not preclude finding a loan to exist based on the facts of this case.
>
> 6.  The record does not establish that the payments do <u>not</u> constitute a loan within the meaning of SSR 92-8p.
>
> 7.  The record does not establish that the payments represent a loan that must be repaid within the meaning of SSR 92-8 [<u>sic</u>].
>
> 8.  Claimant has failed to sustain the burden of proving that a loan exists.
>
> 9.  No valid loan agreement existed regarding the in kind advance pursuant to SSR 92-8p and <u>Secretary of HHS v. Cequerra</u>, 933 F.2d (9th Cir. 1991) [<u>sic</u>].

<u>Id</u>. at 163-64.

18

On September 23, 2005, Claimant timely appealed ALJ Kaplan's decision to the Appeals Council, claiming both an error of law by ALJ Kaplan and bias.  <u>Id</u>. at 149-51.  The Appeals Council denied the appeal on October 21, 2005, and adopted ALJ Kaplan's decision as that of the SSA.  <u>Id</u>. at 146-48.  On November 10, 2005, Claimant filed the instant complaint, timely appealing the latter decision, but no longer making any allegation of bias.

**III.  <u>LEGAL STANDARD</u>**

The Court will reverse the SSA's decision to reduce SSI benefits only "if it is not supported by substantial evidence or based on legal error."  <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation omitted).  "Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Sandgathe v. Charter</u>, 108 F.3d 978, 980 (9th Cir. 1995).  Credibility determinations of witness testimony are left to the ALJ, <u>Lewis v. Apfel</u>, 236 F.3d 503, 509 (9th Cir. 2001), but like all findings of fact must be supported by substantial evidence in the record.  <u>Cequerra v. Sec'y of Health and Human Serv.</u>, 933 F.2d 735, 738 (9th Cir. 1991).  Finally, "[a] decision of the ALJ will not be reversed for errors that are harmless," <u>Burch</u>, 400 F.3d at 679, and a reviewing court has "the power to enter, upon pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. 405(g).

As with any motion for summary judgment, the movant "always

19

1 bears the initial responsibility of informing the District Court

2 of the basis for its motion, and identifying those portions of the

3 pleadings, depositions, answers to interrogatories, and admissions

4 on file, together with the affidavits, if any, which it believes

5 demonstrate the absence of a genuine issue of material fact."

6 <u>Celotex v. Catrett</u>, 377 U.S. 317, 323 (1986).

7 **IV.  DISCUSSION**

8     Though far from models of clarity, Claimant's Motion for

9 Summary Judgment ("MSJ") and Claimant's Opposition to Defendant's

10 Cross Motion for Summary Judgment ("Claimant's Opposition")

11 together contain two main arguments for overturning the SSA's

12 decision:  1) the Appeals Council's instructions to the ALJ

13 (ultimately ALJ Kaplan) contained in the Appeals Council 2005

14 Remand Order constituted a reverseable error of law; and 2) ALJ

15 Kaplan's taking of the testimony of Max Handley and Claimant to

16 determine whether a valid loan agreement existed under California

17 law concerning the Interim In-Kind Support did as well.  <u>See</u> MSJ;

18 Claimant's Opposition.  The Government's Cross-Motion for Summary

19 Judgment ("Cross-Motion"), in response, refutes both contentions

20 and requests that ALJ Kaplan's decision be affirmed.  <u>See</u> Cross-

21 Motion.

22     For the reasons discussed below, the Court finds that:

23 1) the Appeals Council 2005 Remand Order does not constitute a

24 final decision of the SSA, and so is not reviewable by this Court;

25 2) ALJ Kaplan was correct in taking the testimony of Claimant and

26 Max Handley to determine whether a valid loan agreement under

27 California law existed concerning the Interim In-Kind Support, and

28

20

1   any error committed by ALJ Kaplan in the manner in which he

2   formulated his decision was harmless.  Claimant's MSJ is therefore

3   DENIED, the Government's Cross-Motion GRANTED, and the decision of

4   the SSA is AFFIRMED.

5       A.   Appeals Council 2005 Remand Order

6       Claimant's first claim of error is that the instructions

7   contained in the Appeals Council 2005 Remand Order constituted a

8   reverseable error of law.  See MSJ; Claimant's Opposition.  The

9   Court dismisses this claim on the ground that the Appeals Council

10  2005 Remand Order constitutes a non-final decision of the SSA, to

11  which the Court has no subject matter jurisdiction to hear

12  challenges.  Matlock v. Sullivan, 908 F.2d 492, 493 (9th Cir.

13  1990).[5]

14      Claimant characterizes the legal error allegedly committed by

15  Appeals Council alternatively as failing to follow the "rule of

16  mandate" or as violating the "law of the case."  In particular,

17  Claimant points to instructions in the Appeals Council 2005 Remand

18  Order which instruct the ALJ upon remand to "obtain the testimony

19  of the claimant and his father/representative payee and will

20  question them closely regarding the terms of the original oral

21  loan, subsequent 'reaffirmations', and, finally, the written loan

22  document."  AR at 171.  According to Claimant this "misrepresented

23  California law," Claimant's Opposition at 4, and thus constituted

24  a failure to follow the Court's Stipulated Remand Order, a failure

25  _____

26      [5] Though Defendant's papers fail to raise a jurisdictional
    challenge to this claim of error by Claimant, subject matter
27  jurisdiction is unwaivable and the Court is obligated to address
    such issues sua sponte, if necessary.

28

United States District Court
For the Northern District of California

which Claimant describes as violation of the "law of the case" and/or "rule of mandate."  MSJ at 4.  For the sake of clarity, the Court notes that Claimant's claim of error in this regard is more properly characterized as simply an error of law.  <u>Sullivan v. Hudson</u>, 490 U.S. 877, 886 (1989) ("Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.")

But regardless how Claimant might choose to characterize his claim of an error by the Appeals Council in its formulation of its 2005 Remand Order, it fails, because that order is a non-final decision by the SSA which this Court cannot review.  "The Social Security Act ("Act") limits judicial review to 'final decision[s] of the Secretary made after a hearing.'"  <u>Matlock</u> 908 F.2d at 493 (quoting 42 U.S.C. § 405(g) and additionally citing 42 U.S.C. § 405(h)).  As the court in <u>Matlock</u> noted, the Act does not establish what constitutes a "final decision," but rather leaves it to SSA to "flesh out by regulation."  <u>Id</u>. (internal citation omitted).  Section 404.984 of the Social Security Regulations states, "[i]n accordance with § 404.983, when a case is remanded by a Federal court for further consideration, the decision of the administrative law judge will become the final decision of the Commissioner after remand on your case unless the Appeals Council assumes jurisdiction of the case."  20 C.F.R. § 404.948.[6]  The

---

[6] Section 404.983 gives the Appeals Council the discretion, upon remand of a case from a Federal court, to make a decision itself or to remand the case to an ALJ.  20 C.F.R. § 404.983.

United States District Court<br>For the Northern District of California

Appeals Council did not assume jurisdiction when it remanded the case to ALJ Kaplan, and so ALJ Kaplan's decision, after it was adopted by the Appeals Council on October 21, 2005, AR. at 146-48, became the final decision of the SSA.  It is therefore ALJ Kaplan's decision, and not the Appeals Council 2005 Remand Order, which is reviewable by this Court.  See Pallotta v. Barnhart, 144 Fed. Appx. 938, 940 (3rd Cir. 2005); Bowman v. Secretary of Health & Human Services, 986 F.2d 1426 (10th Cir. 1993)(table decision).[7]

B.    ALJ Kaplan's Determination

Claimant raises, in his MSJ and Opposition, and to a greater and lesser degree argues, various reasons why ALJ Kaplan's decision should be over-turned.  Rather than spend the time outlining each, the court will deal (and dispose of) each in turn.

1)    Alleged Errors of Fact

Twice in its papers, Claimant makes bald assertions that ALJ Kaplan made factual errors in his determination:  "Commissioner's actions, findings and conclusions were not supported by substantial evidence," MSJ at 2; "Plaintiff alleges that the ALJ has unfairly and inaccurately summarized the facts in his decision August 26, 2005."  Claimant's Opposition at 2.  The Court can

_____

[7] Claimant's own pleadings, in fact, admit that the ultimate location of the alleged legal error, if any, rests with ALJ Kaplan: "Because the ALJ relied on the Appeals Councils [sic] rendering of California law, the Appeals Council's error became the ALJ's failure to follow 'rule of mandate' because the charge to the Appeals Council and ultimately to the ALJ was to make the determination following California law."  Claimant's Opposition at 4 (emphasis added).  It thus is not only proper under the law, but also makes logical sense, for the Court to judge whether the SSA committed the alleged legal error where that error, if any, actually occurred, viz., in the context of the decision by ALJ Kaplan.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

perceive of no support for these allegations in the record.

Furthermore, Claimant has itself offered no argument to support

them.  The Court, thus, denies that part of Claimant's MSJ based

on these allegations.  See Celotex 377 U.S. at 323.

>    2)    Alleged Legal Errors

Claimant, more or less clearly, also makes two claims of

reverseable legal error by ALJ Kaplan.  Both fail.

>         a)    ALJ Kaplan's Provisional Determination

Claimant first argues ALJ Kaplan's finding that "[n]othing in

California law precludes finding a loan to exist under the

circumstances of this case,"  MSJ at 5 (quoting AR at 158),

constitutes a finding that "the memorialization was a valid loan

under California law and thus binding on the parties which was

sufficient under Defendant's own Rule SSR 92-8p."  Id.

This argument first fails for the plain reason that the

finding was preliminary and provisional:  ALJ Kaplan's ultimate

finding was that "[n]o valid loan agreement existed."  AR at 164.

Though it is unfortunate that ALJ Kaplan was not clearer in this

regard, ALJ Kaplan appears to have made this provisional finding

in response to clauses in SSR 92-8p which make clear the

requirement that a loan be "enforceable under State law" is to be

interpreted as broadly as the applicable state law allows.  SSR

92-8p(1).  In this regard, Section 1 of the ruling states that "as

long as it is enforceable under State law," a loan may be "cash or

an in-kind advance," it can be a "commercial or non-commercial

loan (between relatives, friends or others)," and the agreement on

24

which it is based "may be oral or written."  SSR 92-8p(1).[8]  ALJ
Kaplan's provisional finding constituted only a determination
that, as an initial matter, California law recognized the
possibility of an enforceable loan existing, if the circumstances
were as alleged.

       While, for reasons explained below, this does not affect the
Court's ultimate decision to affirm ALJ Kaplan's decision, the
Court does agree with Claimant's implicit argument--which the
Government seems also to implicitly accept--that the key
determination for ALJ Kaplan was whether the Interim In-Kind
Support constituted an enforceable loan under California law.
The two times the Ninth Circuit Court of Appeals has been called
on to determine what constitutes a loan for the purposes of
deciding whether an SSI beneficiary's benefits should be reduced
under 20 C.F.R. § 416.1103—first under former ruling SSR 78-26 and
second under current SSR 92-8p--it has focused the inquiry on
whether the alleged loan was "enforceable under state law."
Sharma v. Barnhart,32 Fed. Appx. 236, 238 (9th Cir. 2002);
Cequerra 933 at 739-40.  This is supported by the text of SSR 92-
8p, which defines a loan twice in its Section 1 by reference to
whether the alleged loan is enforceable under state law, SSR 92-
8p(1), and refers back to Section 1 in subsequent sections, when

       [8] The Court notes in this regard that the SSA issued SSR 92-8p
to supercede its former ruling on the subject, SSR 78-26, in
response to the decisions of the Fifth Circuit Court of Appeals in
Hickman v. Bowen 803 F.2d 1377 (5th Cir. 1986) and Ninth Circuit
Court of Appeals in Cequerra 933 F.2d 735, which both found inter
alia that SSR 78-26 improperly excluded advances of in-kind support
in its definition of qualifying loans.  SSR 92-8p, Background.

United States District Court
For the Northern District of California

the result turns on whether something is a loan.  <u>See</u> SSR 92-8p(2), (4).  Thus, ALJ Kaplan's somewhat convoluted and confusing parsing of Section 1 of SSR 92-8p and reference to Section 3 of SSR 92-8p was unnecessary and incorrect.  <u>See</u> <u>supra</u> p. 16.  The only inquiry which ALJ Kaplan was required to conduct under SSR 92-8p and the Court's Stipulated Remand Order was whether there existed a valid loan agreement covering the Interim In-Kind Support, enforceable under California law.  However, as explained below, ALJ Kaplan committed no legal error in the manner in which he conducted his hearing, and his ultimate determination that no such valid loan agreement existed was also correct, thus any error ALJ Kaplan committed by formulating his decision in the manner he did was harmless.

       b)   <u>ALJ Kaplan's Consideration of Parol Evidence</u>

Claimant's other claim that ALJ Kaplan committed a reverseable legal error mirror's Claimant's misplaced argument regarding the Appeals Council 2005 Remand Order discussed above: ALJ Kaplan improperly considered parol evidence, specifically the testimony by Claimant and Max Handley, in reaching his determination that there was no valid loan agreement covering the Interim In-Kind Support.  This argument also fails.

As an initial matter, Claimant's argument demonstrates a fundamental misunderstanding of the task which ALJ Kaplan was given and thus the law which applies to it.  Claimant, citing the existence of a written instrument in the form of the Promissory note, states that ALJ Kaplan was required, under California law, to first "determine whether the language of the written contract

26

was 'reasonably susceptible' to an interpretation of more than one meaning," before he made recourse to extrinsic evidence. Claimant's Opposition at 4.  However, the Court's Stipulated Remand Order, the Appeals Council 2005 Remand Order, and ALJ Kaplan's decision all make clear that the issue before ALJ Kaplan was not the interpretation of the alleged loan agreement but its <u>validity</u>.  AR at 166, 171, 156.  California law specifically allows the introduction of extrinsic evidence to determine the validity of an agreement, written or otherwise.  "Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue."  Cal. Code. Civ. Prod. § 1856(f); <u>see</u> <u>also</u> Cal. Code. Civ. Prod. § 1856(g) (allowing consideration of extrinsic evidence to, <u>inter alia</u>, establish allegations of the fraudulent nature of an agreement).

Thus, some of the cases cited by Claimant do support the proposition that California law places some restrictions on recourse to extrinsic evidence when interpreting a written agreement.  <u>See</u>, <u>e.g.</u>, MSJ at 7 (quoting <u>City of Hope National Medical Center v. Genetch, Inc.</u>, 123 Cal. Rptr. 3d 234, 246-247 (Cal. App. 2005) ("The test of admissibility if extrinsic evidence to <u>explain the meaning</u> of a written instrument . . . If the language is in fact fairly susceptible to two <u>interpretations</u>.") (modifications and emphasis added).  But Claimant is incorrect in its assertion that the proposition applies here where the issue is not the interpretation of a loan agreement covering the Interim In-Kind Support but rather its existence and validity.

The fact that the written agreement in this case is the

27

**United States District Court**
For the Northern District of California

Promissory Note which alleges to "reaffirm" a prior oral promise by the Claimant somewhat complicates, but does not fundamentally change the situation.  AR at 142.  The Promissory Note is held by Max Handley, rather than a holder in due course, and thus its enforcement is subject to the same defenses as apply to the enforcement of a simple contract.  Cal. Com. Code § 3305(a)(2). And in evaluating these defenses, ALJ Kaplan was subject to the same general rules regarding the admissibility of extrinsic evidence discussed above.  FPI Development, Inc. v. Nakashima, 231 Cal. App. 3d 367, 376 (3d Dist. 1991).

Thus, ALJ Kaplan was free to test the validity of the Promissory Note by taking extrinsic evidence to determine whether the note was fraudulent or a "sham."  FPI Development, Inc. 231 Cal. App. 3d at 401 ("Where the defense is that the writing is a sham, i.e., no jural act at all, the parol evidence rule, strictly speaking, has no application. That the writing is a promissory note affords no categorical basis for exception.") (internal citations omitted); Cal. Code. Civ. Prod. § 1856(g).  And ALJ Kaplan was free to test the Promissory Note's validity by taking extrinsic evidence to determine whether it was given for consideration.  Saks v. Charity Mission Baptist Church, 90 Cal. App. 4th 1116, 1134 (2d Dist. 2001) ("[T]he absence of consideration is always a defense to a suit on a promissory note and since an instrument lacking in consideration is invalid this fact may be shown by extrinsic evidence.") (internal citations omitted); Colorado National Bank v. Bohm, 286 F.2d 494, 496 (9th Cir. 1961); Cal. Code. Civ. Prod. § 1856(f).  A pre-existing debt,

or "antecedent claim," can constitute sufficient consideration to support the validity of a promissory note, Cal. Com. Code § 3303(a)(3), (b), and therefore can be tested, as any other claim of consideration, by recourse to extrinsic evidence. <u>See</u>, <u>generally</u>, <u>McKay v. Security-First Nat. Bank of Los Angeles</u>, 35 Cal. App. 2d 349, 354 (2d Dist. 1939).

Thus, it was completely proper for ALJ Kaplan to query Claimant and Max Handley regarding the circumstances under which the Promissory Note was concluded, including the fact that it was drafted five years after the oral promise allegedly took place and on the eve of a proceeding before the SSA and for the admitted purpose of helping Claimant's position in that proceeding. <u>See</u> <u>supra</u> ¶. 10-12, 14-15. Such an inquiry goes to whether the Promissory Note was a sham, and thus its validity. <u>FPI</u> <u>Development, Inc.</u> 231 Cal. App. 3d at 401. It was also proper for ALJ Kaplan to query Claimant and Max regarding the alleged oral promise that the Promissory Note purports to affirm. <u>See</u> <u>supra</u> ¶. 13-15. As discussed above, a pre-existing debt can constitute sufficient consideration for a promissory note, thus ALJ Kaplan was wholly within the law to inquire whether Claimant really owed Max Handley a pre-existing debt flowing from an oral agreement regarding the Interim In-Kind Support made at the time it was given. Further, as ALJ Kaplan correctly noted, there is no requirement under California law, and thus SSR 92-8p, that a loan agreement be written, thus the validity of the alleged oral loan agreement was potentially independently dispositive. For either purpose, it was unquestionably proper for ALJ Kaplan to examine

**United States District Court**
For the Northern District of California

both Claimant and Max Handley so as to determine whether an oral loan agreement manifesting their mutual intent was ever formed. <u>Banner Entertainment, Inc. v. Superior Court</u>, 62 Cal. App. 4th. 348, 358-59 (2d Dist. 1998).[9]

As the Court noted above, while it finds no error in the manner in which ALJ Kaplan conducted the hearing just described, it does not approve of the way he subsequently formulated his decision. ALJ Kaplan, properly, should have drafted his decision along the lines which the above discussion suggests. First, he should have made a finding one way or another whether the Promissory Note was a sham. Second, he should have made a finding whether there was a valid oral agreement under California law which covered the Interim In-Kind Support: either as the basis for Claimant's alleged oral promise which the Promissory Note purports to reaffirm and which is therefore alleged to form the consideration for the Promissory Note; or, if he found the Promissory Note was a sham, as an independent basis for finding the Interim In-Kind Support was a loan.

It would, however, be needless formalism to remand the case back to ALJ Kaplan or another ALJ for this reason. The Court is comfortable on the basis of the Record, including ALJ Kaplan's

---

[9]   As noted above, Claimant's arguments regarding the Appeals Council's and/or ALJ Kaplan's failure to follow the "rule of mandate" or the "law of the case" are more properly characterized as an argument that the SSA failed to follow the terms of the Court's Stipulated Remand Order, which, if proved, would constitute an error of law. Because the Court finds no error under California law in the manner in which ALJ Kaplan conducted the hearing on remand, it finds that ALJ Kaplan did not violate the terms of the Court's Stipulated Remand Order.

30

very competent questioning of Max Handley and the Claimant, to determine for itself, as it is free to, that there was no valid oral agreement under California law covering the Interim In-Kind Support, either to support the Promissory Note or to provide an independent basis for finding a loan.  However, the Court sees no need to do so.

Though his wording could have been more precise, ALJ Kaplan made more than adequate findings to support the conclusion that there was no valid oral loan agreement, which was necessary, in any event, to reach his formal finding that "[n]o valid loan agreement existed regarding the in kind advance pursuant to SSR 92-8p and <u>Secretary of HHS v. Cequerra</u>, 933 F.2d (9th Circuit 1991) [sic]."  AR at 164.  These include the specific finding "that the advance was not made with the understanding that there must be repayment."  <u>Id</u>. at 162.  This finding is directly at odds with a determination that Max Handley and Claimant shared a "[m]utual intent" at the time the Interim In-Kind Support was provided that the support constituted an enforceable loan.  <u>Banner Entertainment, Inc.</u>, 62 Cal. App. 4th at 358.  Such "[m]utual intent is determinative of contract formation," and thus its absence defeats Claimant's assertion that a valid oral loan agreement was concluded between Claimant and Max Handley regarding the Interim In-Kind Support, "because there is no contract unless the parties thereto assent."  <u>Id</u>.

This, and ALJ Kaplan's other related findings, are based on substantial evidence garnered from Max Handley's testimony, much of which ALJ Kaplan quotes extensively in his decision.  ALJ

31

United States District Court
For the Northern District of California

Kaplan's determination that Claimant's contrary assertions were not credible are fully explained in his decision and are more than substantially supported by the evidence in the Record.  AR at 163.

**V.     CONCLUSION**

For the aforementioned reasons, Claimant's Motion for Summary Judgment is hereby DENIED in full, Defendant's Cross-Motion for Summary Judgment is hereby GRANTED, and the decision of the SSA is AFFIRMED.

IT IS SO ORDERED.

Dated: July 28, 2006

_____
UNITED STATES DISTRICT JUDGE